Receipt number 9998-4373111

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Bid Protest

**FILED**

Dec 18 2017

U.S. COURT OF
FEDERAL CLAIMS

| | |
|---|---|
| THE CBE GROUP, INC.,<br><br>       Plaintiff,<br><br>  v.<br><br>THE UNITED STATES OF AMERICA,<br><br>       Defendant. | Case No. _____ **17-1970 C**<br><br>Judge _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The CBE Group, Inc. ("CBE"), through undersigned counsel, files this complaint for declaratory and injunctive relief and alleges as follows:

## NATURE OF THE CASE

1.      Plaintiff CBE brings this suit to set aside and enjoin the actions of Defendant, the United States of America, acting by the Department of Education (the "Agency" or "ED").  Contrary to applicable law, regulation, and the terms of the incumbent task orders issued under ED-FSA-09-000178, (the "Solicitation"), ED purported to issue Award Term Extension (ATE) task order contracts to Alltran Education, Inc. and Pioneer Credit Recovery, Inc. (collectively "the ATEs").  Those award decisions violate the Competition in Contracting Act ("CICA"), the Federal Acquisition Regulations ("FAR"), and the Department of Education Acquisition Regulations ("EDAR") and they exceed whatever procurement authority was set forth in clause H.4 of the incumbent task orders.

445924.1

2.      The purported awards are improper because ED's authority to issue any award term extensions under clause H.4 of the incumbent PCA service task orders and EDAR § 3416.470 expired on October 22, 2014.  As such, the purported awards have no legal basis and must be cancelled.

3.      The decision to proceed with illegal task order awards premised on the expired authority of the H.4 award term extension provision is arbitrary, capricious and contrary to law.  It also is irrational where ED has available small business contracts to provide PCA services.  ED can also use the seven contracts awarded under full and open competition in December 2016 to perform this work or, as soon as it completes corrective action, could allow the newly-selected awardees to perform.

4.      CBE acknowledges that ED was enjoined from using the small business contracts until December 8, but that obstacle is no longer in place.  ED is, at present, enjoined from using the December 2016 awardees, but an injunction preventing ED's performance on legally intact awards is no excuse for substituting illegal awards.

5.      ED has been attempting, since July of 2013, to complete a follow-on procurement to continue its program of default collection services that has been in place for over 36 years.  Now 52 months later, the planned follow-on procurement is in a months-long corrective action with no resolution forecast.[1]  This Court has ordered ED to complete corrective action by January 11.  *See Continental Serv. Gp. v. United States*, Case No. 1:17-cv-00449 (Fed. Cl.), Dkt#215.  At least one Protester predicts that Order will go unheeded.  *Id.* at Dkt#219 at 4, ConServe's Motion seeking a monthly cap of 140,000 transfers ("If the

---

[1] *See* Transcript *Continental Serv. Gp., Inc., et al. v. United States*, Case No. 2017-2155 (Fed. Cir.).

445924.1

past is any indication, ED will not move expeditiously to complete corrective action and will continue to siphon off work from this procurement.")

6.     CBE previously challenged the award of any and all ATE contracts with this Court on March 19, 2015.  *See The CBE Gp., Inc. v. United States*, Case No. 1:15-cv-00290-FMA.  At the time, several other protesters had also challenged the awards, though on different grounds than alleged by CBE.  Whereas CBE alleged all ATE contracts were illegal, the other Protesters argued ATEs were valid, and that the each of them should also have received one.  At the time those original ATE protests were filed, a since-canceled follow-on procurement was under pre-award protest at GAO.  *See Financial Asset Management Systems, Inc*., B-409722.9, Apr. 24, 2015, 2015 CPD ¶ 145.

7.     On April 15, 2015, CBE voluntarily dismissed its ATE protest based on the Government's statement to the Court that the then-pending resolution of a GAO pre-award protest would allow ED to make awards in the follow on procurement within two weeks, which would in turn moot the pending protests on the ATE contracts.  That was over two and a half years ago.

8.     ED inexplicably canceled that procurement after defeating the pre-award GAO protests.  *See Financial Asset Management Systems, Inc*., *supra*, 2015 CPD ¶ 145 (rejecting challenges relating to the planned evaluation of past performance).  ED then re-issued a revised solicitation eight months later on December 11, 2015, and finally made awards on December 9, 2016.

9.     Those awards were first subject to protest at GAO.  *See General Revenue Corp., et al.*, B-414220.2, *et al*., Mar. 27, 2017, 2017 CPD ¶ 106.  After GAO's decision, various protesters filed suit in this Court.  *Continental Serv. Gp. v. United States*, Case No.

1:17-cv-00449 (Fed. Cl.)(consolidated with *Alltran Ed., Inc. v. United States*, Case No. 1:17-cv-00517 (Fed. Cl)*, Account Control Tech., Inc. v. United States*, Case No. 1:17-cv-00493 (Fed. Cl.)); *Collection Tech., Inc. v. United States*, Case No. 1:17-cv-00578 (Fed. Cl.); *Automated Collection Servs., Inc. v. United States*, Case No. 1:17-cv-00765 (Fed. Cl.); *Pioneer Credit Recovery, Inc. v. United States*, Case No. 1:17-cv-00499 (Fed. Cl.).

10.     In the meantime, the litigation over the ATE contracts continued up to the Federal Circuit and back on remand with jurisdiction established.  On April 28, 2017, after the GAO protest litigation was complete and after this Court had enjoined the movement of any work to other contracting vehicles, ED informed the Court that as part of corrective action it had offered ATE awards to Alltran and Pioneer in what the parties refer to as "the *Coast* litigation."[2]  *See Coast Prof'l, Inc. v. United States*, 1:15-cv-00207,Dkt. #231, at 1.  However, ED informed the Court that "[i]n light of the on-going proceedings and the Court's orders in *Continental Services v. United States*, Case No. 17-449, as well as the other recently-filed related cases, ED will not transfer any accounts to [Alltran] or Pioneer under the newly issued award-term-extension task orders resulting from the corrective action in this case until further guidance is provided by the Court."  *Id*. at 2.

11.     As a result of this case, and the other related cases, ED did not make any placements on the illegal ATE contracts to Alltran and Pioneer.  Due to the recently partially-lifted stay imposed in a protest of the December 2016 ED contract awards, ED had amassed a backlog of at least 927,166 defaulted student loans.

---

[2] The status report references Alltran's predecessor in intertest, Enterprise Recovery Systems, Inc, who held the prior contract upon which the ATE was based.

12.     ED announced on May 19, 2017, that it would undertake corrective action relating to the December 2016 awards.  It told the Court that it would complete its reevaluations by August 25, 2017.

13.     ED provided Chief Judge Braden with several status reports, all of which indicated that "this corrective action is a top priority of [FSA], and ED is working diligently to complete the corrective action."

14.     Yet before the Federal Circuit on December 8, nearly two months after the evaluation reports were supposedly finalized, DOJ informed the Federal Circuit that the status of the corrective action is uncertain saying, *inter alia* the Agency "has to evaluate the…offers that it has received."

15.     On May 22, 2017, Continental Service Group, Inc. (ConServe) filed a Complaint challenging ED's decision to make two ATE awards as corrective action in the *Coast* litigation as "beyond the scope of the 2009 Task Orders and 2015 ATEs [and] without full and open competition."  *See Continental Serv. Gp., Inc. v. United States*, Case No. 17-664-SGB.

16.     On December 4, 2017, the Court dismissed ConServe's protest on the grounds that ConServe was not an interested party.  *Id*. at Docket #57 at 13.  No decision of any Court has addressed, in any way, the validity of the ATE contracts.

17.     Days later on December 8, 2017, the Federal Circuit lifted the injunction that had been in place over the new procurement with respect to "transferring work to be performed under the contract at issue in this case to other contracting vehicles to circumvent or moot this bid protest."  *See Continental Serv. Gp. Inc. v. United States*, Case No. 17-2155, Dkt. #308, at 6 (Fed. Cir.).

5

18.     In the hours following the Federal Circuit's bench order, ED issued Alltran and Pioneer 162,083 accounts each on the illegal ATE contracts.

19.     On the first business day following the Federal Circuit's revision of the injunction that had been in place for 9 months, CBE sought reconsideration by the Federal Circuit.  That filing and a Notice pleading to this Court advised of CBE's intention to file this Complaint.

## JURISDICTION

20.     This is a protest action by an interested party "objecting to… the award of a contract [and] alleged violation[s] of statute or regulation in connection with a procurement…."  28 U.S.C. § 1491(b)(1).  Thus, this Court has jurisdiction.

## STANDING

21.     Plaintiff will be irreparably harmed by ED's actions, because the illegal award term extensions displace ED's need for PCA collections of defaulted student loans.  CBE is an incumbent PCA, and it is an awardee under the follow-on solicitation, for which corrective action was to have been completed months ago.  It would also be an awardee under *any* fair competition to procure PCA services.  CBE has a direct economic interest in the Agency's decision to make these illegal award term extensions because the awards went to two PCAs that CBE beat in full and open competition, and cover work CBE would be performing but for ED's misguided attempts to meet its needs without competition.

22.     If ED completes its corrective action by January 11, as this Court has ordered, and if ED uses its available authority to justify moving forward notwithstanding inevitable protests, all of the work that was improperly transferred to Alltran and Pioneer would be available for CBE and other awardees to perform.  Similarly, if this Court lifts the injunction

6

with respect to the December 2016 awardees, as was urged during this Court's December 12 status conference, CBE and other awardees would be able to service all of the accounts improperly transferred to Alltran and Pioneer.

## PARTIES

23.     Plaintiff CBE is a business process services company providing third party collection services to diverse industries, including: communications, financial, utility, healthcare, government, and education.  It serviced defaulted federal student loans for ED under the incumbent PCA task order contract, and was an awardee under the follow on procurement.  Until they were recalled last week, CBE retained in-repayment accounts that had already been transferred to its December 2016 award.

24.     Defendant is the United States of America, acting by and through ED via a General Services Administration Federal Supply Schedule task order procurement for private agency collection of student loans. Presumptive Defendant-Intervenors are two PCAs that were awarded illegal H.4 award term extensions as part of corrective action in a prior protest.

## FACTUAL BACKGROUND

### A.     Award and Performance of the Incumbent Task Orders

25.     Since 1981, ED has contracted with PCAs to support collection and administrative resolution activities on borrower debts.  In July 2009, ED issued 17 unrestricted and 5 small business task order awards pursuant to Solicitation ED-FSA-09-000178.  *See e.g.* Exhibit A, CBE Task Order.  The task orders awarded to the PCAs provided that the first ordering period would be for a period of twenty-four (24) months, beginning July 1, 2009 with multiple optional ordering periods.  *Id*. at § B.3.  The total of all ordering periods, excluding any award term(s) earned, was not to exceed 60 months from the

7

date of initial data transfer, October 22, 2009.  Allowing for the orderly resolution of accounts, the task order also provided for a twenty-four (24) month "In-Repayment Retention Period" that was to begin after the last optional ordering period exercised.  The task order provided for ED's transfer of accounts both *from* prior task orders and *to* subsequent task orders.  *Id*.

26.     According to the terms of the task orders, PCAs were in constant competition for market share of ED's defaulted student loan portfolio based upon a comprehensive scoring scheme called Competitive Performance and Continuous Surveillance ("CPCS").  Exhibit A at § H.5.  Bonus payments and transfers of new accounts were to be based upon each contractor's total CPCS score.  The four performance indicators that contributed to CPCS scores were to be: (1) Dollars Collected Percentage, (2) Account Servicing Percentage, (3) Administrative Resolution Percentage, and (4) Small Business Subcontracting.

### B.     Reliability of CPCS Data

27.     ED's past CPCS scores have been called into question by Congress, GAO, ED's Inspector General, and ED itself.  *See e.g.* GAO-14-256, Federal Student Loans: Better Oversight Could Improve Defaulted Loan Rehabilitation, March 2014, available at http://www.gao.gov/products/gao-14-256.  Thus, blind reliance upon historical CPCS data for award decisions is inherently problematic.

### C.     Protests of the Follow-on Procurement and Gap in Coverage

ED issued a Solicitation for the follow-on procurement of PCA student debt collection services on July 3, 2013.  *See* FedBizOpps posting available at https://www.fbo.gov/spg/ED/FSA/CA/ED-FSA-13-R-0010/listing.html.  That procurement

was the subject of 10 pre-award protests, *the last of which* was resolved on April 24, 2015. Despite having overcome those protests ED canceled that solicitation and issued a replacement.  The subsequent awards were also protested, first at GAO, and then in this Court, beginning in December 2016.

28.     As ED was struggling to overcome protests of the new procurement before this Court, it decided to take corrective action to resolve the ATE litigation.

29.     ED has attempted to cite clause H.4 of the incumbent task orders as authority to make ATE awards of up to twenty-four (24) months to two incumbent PCAs, Alltran and Pioneer.

### D.     Award of Ordering Period Options, Extension of Services, and Award-Term Extensions

30.     Section B.3 of the incumbent task orders expressly limits the total Ordering Period to 60 months after the October 22, 2009 initial data transfer, excluding any award-term extensions earned.  Thus, the total Ordering Period would end not later than October 22, 2014 absent a proper award-term extension.

31.     Separately, and consistent with FAR § 17.208(f) and FAR § 52.217-8, Option to Extend Services, Section H.3 of the incumbent task orders allowed ED to "extend services" for up to an additional six months.  That provision, however, does not extend the total Ordering Period, a term defined by clause B.3 as ending no later than October 22, 2014.

32.     Award-term extensions are permitted under ED's acquisition regulations, subject to certain limitations.  *See* EDAR § 3416.470(e)(1), Award term limitations. Specifically, award term extensions "may be *earned* during the base period, and each option period, *except the last option period*.  Award-term periods may not be earned during the final

9

option year." *Id*.  Also, award-term periods may not exceed twelve (12) months.  *Id*. at § (e)(2).

33.     Section H.4 of the incumbent task orders is consistent with those EDAR limitations.  It provides, in two sub-paragraphs, an explanation of when award-term extensions may be *awarded* (H.4.(c)) and when they are intended to be *performed* (H.4.(b)).  Clause H.4(b) says that it is the Government's intent to time any award-term extension so that the extension period will coincide with the award date of the next round of Task Orders.  "Accordingly, the Contracting Officer may, [sic] determine whether to award an award-term extension at any time after completion of the Ordering Period of the Task Order."  Exhibit A at § H.4(b).

34.     Section H.4(c) imposes specific notice and timing limits on the Contracting Officer's ability to make award-term extensions:

> The Contracting Officer may *award* an award-term extension under this clause by providing a written notice to the Contractor *prior to expiration of the Ordering Period* of the Task Order, provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least 60 days *before the Task Order Ordering Period expires*.

(emphasis added).

**E.     ED's Initial Purported Award Term Extensions**

35.     On or about February 21, 2015, without announcing its contract action publicly, ED issued "award-term extensions" to five incumbent PCAs for periods of up to twenty-four (24) months.  As set forth above, award term extensions had to be *awarded prior to the expiration of the Ordering Period*, which occurred by the terms of the incumbent task orders, not later than October 22, 2014.  Further, notice of ED's intent was required to be

provided sixty (60) days earlier, *i.e.* August 23, 2014. Further, even if those requirements

had been met, EDAR specifically limits such extensions to twelve (12) months.

36.     Those ATE awards were protested by several parties including Pioneer,

Alltran and CBE. While their protests were pending, Pioneer and Alltran had their

incumbent contracts ended early and all accounts recalled (in March 2015) based upon the

adverse findings in a Government compliance audit.

37.     Upon information and belief, no other PCAs have contended, as CBE does,

every ATE awarded after October 22, 2014 is improper.

38.     CBE withdrew its protest only because ED promised that the new awards

would be made shortly after the last pre-award GAO protest was resolved.

39.     ED ultimately did not make the new awards as quickly as promised, and

performance continued under the five illegal ATE awards while the matter went up to the

Federal Circuit and came back down..

40.     In fact, the five original ATE awards that were initially protested all expired

during the course of litigation at the COFC.

41.     The new ATE awards to Alltran and Pioneer are the only two ATE contracts

that have not expired because they were first issued on or about April 28, 2017. These ATE

contracts are, however, every bit as illegal as the previous 5 ATE contracts were.

42.     In the wake of the Federal Circuit's order, ED has begun, for the first time, to

transfer work to these illegal contract vehicles, which injures CBE. The Federal Circuit's

apparent concern, as reflected in exchanges at oral argument, was in lifting the injunction

that had been enjoining the small business contracts. Those contracts were not a part of the

follow on procurement, and were completely separate contracts that were never properly at issue in the case.

### F.       Prejudice to CBE

43.       CBE is a qualified incumbent PCA whose CPCS ratings improved substantially relative to other PCAs following implementation of new rules that improved oversight of PCA collection procedures.  As a result, CBE would normally be entitled to a growing share of defaulted student loan accounts.

44.       In response to the continuing litigation, ED announced corrective action under the follow-on procurement on May 19, 2017, and represented to the Court that reevaluations would be complete by August 25, 2017.  *See Continental Serv. Gp., Inc. v. United States*, Case No. 17-449C, Dkt. #122 at 1-2.

45.       ED has subsequently provided several status reports under oath, all of which indicated that "this corrective action is a top priority of [FSA], and ED is working diligently to complete the corrective action."

     a.   August 4 – "As of the date of this status report, Education has completed a review of more than half of the 37 proposals it has received under the corrective action.  The agency is striving to complete the reevaluation by August 25, 2017" though it listed two contingencies that may impact completion.  Dkt. #183.

     b.   August 24 – "As of the date of this notice, ___ED's evaluation teams have completed their review of all proposals___. Evaluation reports are now being prepared and should be finalized within the next few weeks. After the evaluation is complete, ED's

12

Source Selection Authority will conduct a new source selection determination and announce any new award or awards, and/or the termination of previously-awarded contracts, as appropriate."  Dkt. # 184 (emphasis added).

c.  September 14 – "Evaluation reports are now being finalized, with an expected completion date of September 18, 2017. Once the reports are finalized, ED's Source Selection Authority will perform an integrated assessment to identify the proposal(s) deemed to be most advantageous to the Government, followed by a responsibility determination of each apparently successful offeror."  Dkt. #192.

d.  October 19 – "As of the date of this filing, ***the evaluation reports have been finalized***. The Source Selection Authority has been conducting an assessment of the findings and ratings reported by the evaluating committees in order to identify those proposals that are most advantageous to the Government. Once the apparently successful offeror/s are identified, the contracting officer will complete the responsibility determinations. Award/s will be made shortly thereafter."  Dkt. #197 (emphasis added).

46.     Yet at the Federal Circuit argument on December 8, 2017, nearly two months after the evaluation reports were supposedly finalized, DOJ informed the Federal Circuit that the status of the corrective action is uncertain.

13

But the agency has multiple tasks, ***it has to evaluate the, I believe it's 36 or so, or 38 offers that it has received, it needs to compare them, it needs to consider you know which offers the best value, it needs to determine how many awards it's going to make***, and that involves a lot of back and forth between various components within the agency, and so as a result, it's taking longer than the agency had hoped.  The last time the agency had done these steps it had taken a year.  ***I think it's safe to say it will take less than a year***…

Transcript of Dec. 8, 2017 Hearing (emphasis added).

47.     Instead of focusing on its corrective action, ED has now placed hundreds of thousands of accounts with Alltran and Pioneer on their illegal ATE contracts.  Had ED been proceeding diligently with its corrective action, a share of those accounts would have transferred to CBE, and CBE would have been able to continue to service its recently-recalled in-repayment accounts.  ED's illegal contract awards have caused an immediate loss of revenue, will affect CBE's future profits, and to the extent this nearly four-and-a-half year re-procurement saga continues, CBE will lose its workforce and become less competitive for future work.

### G.     The Public Interest

48.     It is in the public interest to ensure that ED's needs for student loan servicing are procured in a manner that preserves the integrity of the procurement process.

49.     ED's need for servicing defaulted student loans cannot be effectively met by having Alltran and Pioneer provide the lion's share of such services.  Both were awarded illegal ATEs without competition and in contravention of limits in the EDAR and the terms of the incumbent contract after spending two-and-a-half years on the sideline due to adverse audit findings.  Giving them awards premised upon "excellent or better quality performance" and which *must be made* "prior to expiration of the Ordering Period of the Task Order" is preposterous where both Alltran's and Pioneer's contracts were ended early and all accounts

445924.1

recalled in March 2015.  The public interest is served by a legal procurement process that ensures sufficient capacity to meet ED's needs and respects its efforts to ensure that student borrowers receive accurate information and fair treatment.

## CLAIMS FOR RELIEF

## COUNT I

### (Declaratory Relief – Violation of CICA)

50.    CBE incorporates by reference all of the preceding paragraphs.

51.    CICA imposes requirements for competition in federal procurements.  Any decision to procure products or services on behalf of the Government constitutes a procurement subject to CICA.  Where, as here, an Agency awards a contract without authority, it has violated CICA.

52.    CBE seeks a declaration that the purported award-term extensions under the expired authority of clause H.4 of the incumbent task orders was an unlawful procurement in violation of CICA.

## COUNT II

### (Declaratory Relief – Violation of EDAR Regulation)

53.    CBE incorporates by reference all of the preceding paragraphs.

54.    The EDAR applies to procurements conducted by ED.  EDAR authorizes the making of award-term extensions under certain circumstances and with express limitations. *See* EDAR § 3416.470.  Specifically as relevant here, no award term may be earned during the final option year, and award term extensions are limited to 12 months.  There is nothing in the incumbent contracts which authorizes ED to ignore the EDAR requirements.

15

55.     CBE seeks a declaration that the award term extensions violate the binding regulations in EDAR applicable to ED's acquisitions, and are therefore illegal.

## COUNT III

### (Injunctive Relief – Permanent Injunction)

56.     CBE incorporates by reference all of the preceding paragraphs.

57.     CBE has established success on the merits of this case.

58.     CBE has established that it will suffer irreparable injury if it is displaced and therefore deprived of the opportunity to meet ED's default student loan collection needs.

59.     CBE has established that on balance the injury to CBE from being deprived the benefits of its awarded contract and likely re-awarded contract, is sufficient to outweigh the minimal burden on the Agency, which has in place small business task orders to procure these services during the pendency of this matter, and always could have pursued other available and proper methods of procuring these services during any gap prior to award of follow-on task orders.

60.     CBE has established that it is in the public's interest to uphold the integrity of the bid process by ensuring that ED's procedurally and legally invalid award-term extensions are not used to avoid the requirements of the Competition in Contracting Act.  CBE has also established that it is in the public interest to ensure sufficient capacity to service ED's defaulted student loans by responsible PCAs.

61.     CBE seeks a permanent injunction preventing the transfer of defaulted student loans under the illegal H.4 extensions, a recall of the accounts illegally transferred to those vehicles, and the prevention of future award-term extensions under the expired authority of clause H.4.

445924.1

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court grant the following relief:

1.      Enter a declaratory judgment holding that premising awards on the expired H.4 authority was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law or binding regulations;

2.      Issue a permanent injunction prohibiting Defendant from proceeding under the invalid H.4 award-term extensions;

3.      Issue a permanent injunction prohibiting Defendant from making any other award term extensions under the expired authority of clause H.4;

4.      Require Defendant to recall the accounts illegally transferred to Alltran and Pioneer on or about December 9-10, 2017;

5.      Grant Plaintiff such other and further relief as the Court deems just and proper.

Dated:  December 18, 2017        Respectfully submitted,


By: //s// Jeffery M. Chiow
     Jeffery M. Chiow (Counsel of Record)

     Neil H. O'Donnell
     Lucas T. Hanback
     Stephen L. Bacon

ROGERS JOSEPH O'DONNELL
875 15th Street NW, Suite 725
Washington, DC 20005
Tel:  (202) 777-8952
Fax:  (202) 347-8429
Email:  jchiow@rjo.com

*Attorneys for Plaintiff, The CBE Group, Inc.*

445924.1

# Exhibit A

Excerpt of CBE's Incumbent 2009 PCA Task Order

| **SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEMS** *OFFEROR TO COMPLETE BLOCKS 12, 17, 23, 24, & 30* | 1. REQUISITION NUMBER EDOFSA-09-000178 | PAGE 1 OF 78 |
|---|---|---|

| 2. CONTRACT NO. GS-23F-0230P | 3. AWARD/EFFECTIVE DATE JUL 01, 2009 | 4. ORDER NUMBER ED-FSA-09-O-0006 | 5. SOLICITATION NUMBER | 6. SOLICITATION ISSUE DATE |
|---|---|---|---|---|

| 7. FOR SOLICITATION INFORMATION CALL: | a. NAME | b. TELEPHONE NUMBER *(No collect calls)* | 8. OFFER DUE DATE/ LOCAL TIME |
|---|---|---|---|

| 9. ISSUED BY                    CODE  FSA-FS2 | 10. THIS ACQUISITON IS |
|---|---|
| United States Department of Education<br>Federal Student Aid/Mission Support Group<br>630 First St NE - Suite 91F3<br>Washington DC 20202 | ☐ UNRESTRICTED OR ☐ SET ASIDE: ____ % FOR:<br>☐ SMALL BUSINESS  ☐ EMERGING SMALL BUSINESS<br>☐ HUBZONE SMALL BUSINESS<br>NAICS:<br>SIZE STANDARD: ☐ SERVICE-DISABLED VETERAN-OWNED SMALL BUSINESS  ☐ 8(A) |

| 11. DELIVERY FOR FOB DESTINA- TION UNLESS BLOCK IS MARKED<br>☐ SEE SCHEDULE | 12. DISCOUNT TERMS<br>0 Days<br>0%<br>Net 30 | ☐ 13a. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700) | 13b. RATING<br><br>14. METHOD OF SOLICITATION<br>☐ RFQ  ☐ IFB  ☐ RFP |
|---|---|---|---|

| 15. DELIVER TO                   CODE  FSA-FS2 | 16. ADMINISTERED BY                    CODE  FSA-FS2 |
|---|---|
| United States Department of Education<br>Federal Student Aid/Mission Support Group<br>830 First St NE - Suite 91F3 | United States Department of Education<br>Federal Student Aid/Mission Support Group<br>830 First St NE - Suite 91F3 |

| 17a. CONTRACTOR/ OFFEROR  CODE 00020091   FACILITY CODE | 18a. PAYMENT WILL BE MADE BY          CODE  FSA-BUD |
|---|---|
| CBE GROUP INC, THE<br>131 TOWER PARK DR STE 100<br>WATERLOO IA 507019374 | TIN: 421259869<br>CAGE: 3RVX4<br>DUNS: 173609025 | Budget Group/Invoice Admin<br>US Department of Education/FSA/CFO/BG/FSAA<br>830 First Street, NE, Suite 54B1<br>Washington DC 20202-0001 |

TELEPHONE NO.

| ☐ 17b. CHECK IF REMITTANCE IS DIFFERENT AND PUT SUCH ADDRESS IN OFFER | 18b. SUBMIT INVOICES TO ADDRESS SHOWN IN BLOCK 18a UNLESS BLOCK BELOW IS CHECKED  ☐ SEE ADDENDUM |
|---|---|

| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
|---|---|---|---|---|---|
| Please | see continuation page for line item details. | | | | |
| | *(Use Reverse and/or Attach Additional Sheets as Necessary)* | | | | |

| 25. ACCOUNTING AND APPROPRIATION DATA<br>See Schedule | 26. TOTAL AWARD AMOUNT *(For Govt. Use Only)*<br>$1.00 |
|---|---|

| ☐ 27a. SOLICITATION INCORPORATES BY REFERENCE FAR 52.212-1, 52.212-4. FAR 52.212-3 AND 52.212-5 ARE ATTACHED. ADDENDA | ☑ ARE | ☐ ARE NOT ATTACHED |
|---|---|---|
| ☐ 27b. CONTRACT/PURCHASE ORDER INCORPORATES BY REFERENCE FAR 52.212-4. FAR 52.212-5 IS ATTACHED. ADDENDA | ☑ ARE | ☐ ARE NOT ATTACHED |

☒ 28. CONTRACTOR IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN __2__ COPIES TO ISSUING OFFICE. CONTRACTOR AGREES TO FURNISH AND DELIVER ALL ITEMS SET FORTH OR OTHERWISE IDENTIFIED ABOVE AND ON ANY ADDITIONAL SHEETS SUBJECT TO THE TERMS AND CONDITIONS SPECIFIED

☐ 29. AWARD OF CONTRACT: REF. _____ OFFER DATED _____ . YOUR OFFER ON SOLICITATION (BLOCK 5), INCLUDING ANY ADDITIONS OR CHANGES WHICH ARE SET FORTH HEREIN, IS ACCEPTED AS TO ITEMS:

| 30a. SIGNATURE OF OFFEROR/CONTRACTOR | 31a. UNITED STATES OF AMERICA *(SIGNATURE OF CONTRACTING OFFICER)* |
|---|---|
| 30b. NAME AND TITLE OF SIGNER *(Type or print)*<br>Thomas R. Penaluna<br>President & CEO | 30c. DATE SIGNED<br>3/26/2009 | 31b. NAME OF CONTRACTING OFFICER *(Type or print)*<br>Mike Whisler | 31c. DATE SIGNED<br>4/1/09 |

AUTHORIZED FOR LOCAL REPRODUCTION
PREVIOUS EDITION IS NOT USABLE

STANDARD FORM 1449 (REV. 3/2005)
Prescribed by GSA - FAR (48 CFR) 53.212

## SECTION B – SUPPLIES OR SERVICES AND PRICES/COSTS

**B.1   GENERAL**

This Task Order is issued in accordance with the General Services Administration's (GSA) Financial and Business Solutions (FABS) Schedule under Special Item Number (SIN) 520-4 for private collection services.

**B.2   TYPE OF CONTRACT**

This is a Performance-Based, Firm Fixed Price Task Order award, with provisions for pricing arrangements.

**B.3   ORDERING PERIODS**

The first Ordering Period for the Task Orders will be from July 1, 2009 (the effective date) through twenty-four (24) months, with multiple, optional ordering periods. The total Ordering Period, excluding any award term(s) earned, will not exceed 60 months from the date of initial data transfer, or October 22, 2009. This is not a multiyear contract as defined in FAR 17.1.

1) In addition, each contractor shall continue to work on accounts it retains during the **In-Repayment Retention Period.** Upon expiration of the Ordering Period(s) of this Task Order, the in-repayment retention period will begin. If the Government exercises one or more Optional Ordering Periods, the In-Repayment Retention Period shall begin subsequent to the last Optional Ordering Period exercised. The in-repayment retention period will run for twenty-four (24) months, except that upon return, recall or transfer of all accounts from this Task Order, the in-repayment retention period will end. During the in-repayment retention period, the Contractor may retain, except as provided in paragraph (3) below, accounts that remain in repayment in accordance with the SOW. No transfer of accounts to the Contractor will occur during the in-repayment retention period.

2) Prior Private Collection Agency (PCA) Task Orders—If the Contractor holds a prior Task Order (e.g. one awarded in the year 2004) with ED for debt collection services, at any time during the in-repayment retention period of that prior Task Order, ED may transfer any or all accounts from that prior Task Order to this Task Order. Accounts transferred under this provision are subject to the prices and terms of this Task Order, except that the transferred accounts would *not* be included in the Competitive Performance and Continuous Surveillance (CPCS) performance indicators.

3) Subsequent PCA Task Orders—If the Contractor enters into a subsequent Task Order or contract with ED for debt collection services, at any time during the in-repayment retention period of this Task Order, ED may transfer any or all accounts from this Task Order to the new Task Order or contract. Accounts transferred under this provision will be subject to the prices and terms of the Task Order or contract to which the accounts are transferred.

**B.4   PROVISIONS FOR PRICING AND PAYMENT**

A.   The total amount obligated and available for payment under this Task Order is $___1_____. Payment shall be made in accordance with the terms of the GSA Schedule Contract and the Pricing Schedule shown in Clause B.5 and with any other supplemental payment scheme that may otherwise be negotiated and specified.

B.   The Government shall have the right to unilaterally increase the amount of obligated funds under this order at any time in order to provide sufficient funds to cover the anticipated

## SECTION H – SPECIAL TASK ORDER REQUIREMENTS

**H.1   FAR 52.217-9, OPTION TO EXTEND THE TERM OF THE TASK ORDER (Mar 2000) TAILORED**

   (a)   The Government may extend the term of this Task Order by written notice to the Contractor prior to expiration of the first Ordering Period of the Task Order, provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least 60 days before the Task Order period of performance expires. The preliminary notice does not commit the Government to an extension.

   (b)   If the Government exercises this option, the extended Task Order shall be considered to include this option clause.

   (c)   The total duration of the first Ordering Period of performance of this Task Order, including the exercise of any optional Ordering Periods under this clause, shall not exceed 60 months from the date of contract award, excluding any award term(s) earned.

   (d)   The Government may, at its discretion, exercise option periods of up to 24 months, providing that the total Task Order period of performance does not exceed 60 months from the date of award.

If the Government exercises one or more Optional Periods, the 24-month In-Repayment Retention Period will begin subsequent to the last Optional Period exercised.

**H.2   OPTION FOR INCREASED QUANTITY**

The Government may unilaterally increase the quantity of accounts transferred to the Contractor by any amount at the prices specified within Section B, "Pricing Schedule", at any time during the Task Order Ordering Period.

**H.3   FAR 52.217-8, OPTION TO EXTEND SERVICES (Nov 1999)**

The Government may require continued performance of any services within the limits and at the rates specified in the Task Order. These rates may be adjusted only as a result of revisions to prevailing labor rates provided by the Secretary of Labor. This option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months. The Contracting Officer may exercise the option by written notice to the Contractor prior to expiration of the period of performance of the Task Order.

**H.4   AWARD TERM EXTENSION**

In addition to the Ordering Periods stated in Clause B.3 and any options terms exercised pursuant to clause H.1, the Contractor may earn performance extensions (hereinafter called "award terms"), based upon the quality of performance during the evaluation periods. If the Contractor has an average CPCS rating of 75 or greater over the life of the Task Order, or the last 12 CPCS periods (whichever is shorter), the Government may, award the Contractor an award-term extension in accordance with the terms of this clause in recognition of the Contractor's excellent or better quality performance.

   (a) Award-term extensions are subject to the following conditions:

      i.      Funds are available;

      ii.     The requirement covered by the award-term fulfills an existing Government need;

      iii.    The contractor accepts the Government's target pricing and terms.

   (b) It is the Government's intent to time any award-term extension so that the extension period will coincide with the award date of the next round of Task Orders. Accordingly, the Contracting

Officer may, determine whether to award an award-term extension at any time after completion of the Ordering Period of the Task Order.

(c) The Contracting Officer may award an award-term extension under this clause by providing a written notice to the Contractor prior to expiration of the Ordering Period of the Task Order, provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least 60 days before the Task Order Ordering Period expires. The preliminary notice does not commit the Government to an extension.

(d) Decisions regarding the award term are not subject to the Disputes Clause or review by any authority above the Contracting Officer.

(e) Any award-term extension under this clause will be executed in the form of a new Task Order issued by the Contracting Officer under the Contractor's then current GSA Schedule contract.

    i. The award-term Task Order extension will be subject to the terms and conditions of the existing Task Orders, including any extension thereto.

    ii. The effective date of the award-term Task Order extension may be timed to coincide with the award date of the next round of PCA Task Orders.

    iii. The Government target prices for the current PCA Task Orders will apply to the award-term extension.

    iv. If the Contractor is a small business at the time the Contracting Officer issues the award-term Task Order extension, the Contractor will become part of the new Small Business Pool. Otherwise, the Contractor will be included in the new Unrestricted Pool.

    v. A new CPCS record will be established for the award-term extension to track the Contractors' performance in then new CPCS pool.

    vi. The Government may transfer any remaining accounts held by the Contractor under this Task Order to the award-term new Task Order, in accordance with provisions in this Task Order and the award-term Task Order.

## H.5   CONTRACTOR PERFORMANCE EVALUATION

(a) The Competitive Performance and Continuous Surveillance (CPCS), an in-depth evaluation, shall be conducted to determine the adequacy of the contractors' performance on all accounts transferred. CPCS will utilize two separate PCA pools for determining contractor standing. PCAs that received Task Order awards under the small business competition (and have not subsequently transferred to the Unrestricted Pool) will be in the Small Business Pool. All other PCA contractors will be in the Unrestricted Pool.

(b) Several months after the first placement of accounts, the Government shall conduct the first CPCS to measure the relative performance of each PCA contractor during the CPCS surveillance period. This first CPCS surveillance period will run from the first placement of accounts through March 31, 2010. Subsequent CPCS evaluations will be conducted quarterly.

(c) Each contractor that achieves the highest ranking in one of the three primary performance indicators: Dollars Collected, Accounts Serviced and Administrative Resolutions will receive the total potential points for the respective performance indicator. The points assigned to the remaining contractors for the three performance indicators will be based on the relative percentage each contractor is behind the lead contractor.

(d) Bonus payments and transfers of new accounts shall be based upon each contractor's total CPCS score. The contractors with the top two or three CPCS scores will receive bonus payments on dollars collected during the evaluation period as described in Section H.6. A contractor's most recent CPCS score will be applicable for all transfers until the completion of the next regular CPCS evaluation.

(e) The Government will evaluate PCA contractors using the following performance indicators, except as changed in accordance with paragraph (f) of this clause. (All indicators will be measured at two decimal places):

**(1) PERFORMANCE INDICATOR #1: DOLLARS COLLECTED PERCENTAGE - 70 Points.** The Dollars Collected Percentage will be calculated based upon the following formulas:

**Formula #1:**
**DOLLARS COLLECTED FOR THE GOVERNMENT (DC)** –DC is the gross amount the Government realizes before the contractor's commissions have been subtracted from the dollars collected. Dollars collected are defined as regular collections, administrative wage garnishment payments, and the final sale and transfer value of all debts rehabilitated.
Example:
- CA's regular collections and administrative wage garnishment payments sum to $3,500,000 for the three (3) month period.
- CA's final sale of all debts rehabilitated totaled $2,500,000 for the three (3) month period.
- Dollars Collected for the Government is $6,000,000. ($3,500,000 plus $2,500,000).

**Formula #2:**
**CURRENT INVENTORY BALANCE (CIB)**—CIB is the beginning balance of all accounts held by the Contractor at the end of the previous CPCS period. (The Government will assign a fixed CIB for the first CPCS surveillance period.) The inventory balance is comprised of principal, interest and fees. Projected collection costs are not included.
Example:
- Contractor A's ending inventory for Month 3 of the previous CPCS period is $250,000,000 and 60,000 accounts.
- For the CPCS surveillance period, the current inventory balance (CIB) is $200,000,000 and the current inventory of accounts (CIA) is 60,000.

**CURRENT INVENTORY OF ACCOUNTS (CIA)**—CIA is the same as CIB, except accounts, instead of dollars, are measured.

**Formula #3:**
**AVERAGE INVENTORY BALANCE (AIB)**–AIB is the average (mean) CIB from the four most recent CPCS surveillance periods. For the first three CPCS surveillance periods, the AIB will be the average of the CIB from the current and all previous CPCS surveillance periods. The inventory balance is comprised of principal, interest and fees. Projected collection costs are not included.
Example:
- Contractor A's CIB for
  - CPCS period #3 is $200,000,000
  - CPCS period #4 is $233,000,000
  - CPCS period #5 is $242,000,000
  - CPCS period #6 is $248,000,000
- For CPCS period #6, the average inventory balance (AIB) is $230,750,000

**Formula #4:**
**DOLLARS COLLECTED PERCENTAGE (DCP)**–DCP is a percentage determined by dividing DC by AIB, (DC/AIB).
Example:
a.   There are only two contractors in competition.
b.   The DCP following the preceding examples would be:
c.   DC of $6,000, 000 divided by AIB of $230,750,000 equals DCP: 2.60%
d.   Contractor B's DC is $6,250,000 and its AIB is $250,000,000.
e.   Contractor B achieves a DCP of 2.50%.
f.   Contractor A achieves the highest DCP during the surveillance period of 2.60%
g.   For Performance Indicator #1, Contractor A will be awarded the full 70 points while Contractor B will be awarded 67.31 points. [(2.50 / 2.60) X 70].

**(2) PERFORMANCE INDICATOR #2: ACCOUNT SERVICING PERCENTAGE (ASP) - 20 Points.**
ASP is the proportion of the sum of the net number of:
a.   Accounts approved, and if required returned, for administrative resolution (only one administration resolution is counted in CPCS per *account* resolved), and
b.   Accounts that had payments received during the CPCS surveillance period.

The ASP would be calculated as follows:
a.   Contractor A submitted and was approved for 1,500 litigation accounts, returned and approved for 500 non-cash account resolutions, and received payments on 3,250 accounts. Total accounts serviced sum to 5,250. The contractor's CIA is 50,000. ASP is 5,250 divided by 50,000 or 10.50%.
b.   Contractor B submitted and was approved for 750 litigation accounts, returned and approved for 250 non-cash account resolutions, and received payments on 2,000 accounts. The total accounts serviced sum to 3,000. The contractor's CIA is 60,000. ASP is 3,000 divided by 60,000 or 5.0%.
c.   For Performance Indicator #2, since Contractor A has the best ASP, Contractor A will be awarded the full 20 points. Contractor B will be awarded 9.52 points. ((5.0/10.50) x 20))

**(3) PERFORMANCE INDICATOR #3: ADMINISTRATIVE RESOLUTION PERCENTAGE (ARP) - 10 points.** ARP is the proportion of accounts prepared and, if required, returned for non-cash resolution to ED. Only one administration resolution is counted in CPCS per *account* resolved. See preceding example for Performance Indicator #2 for calculation methodology.

**(4) SMALL BUSINESS SUBCONTRACTING – A plus or minus range of points.** This performance indicator only applies to contractors in the Unrestricted Pool. This performance indicator will not be used for CPCS period #1 and will not begin until initiated by the Government. At least thirty days before the start of the first CPCS period to which a Small Business Subcontracting measure will apply, the Government shall provide to the Contractor the measurement factors, relative weights, point range, targets, formulas and methodology related to calculation of the Small Business Subcontracting performance indicator.

When implemented, the Small Business Subcontracting performance indicator will measure contractors' small business subcontracting relative to the targets and intent described in

subsection H.15 (b) of this Task Order. Contractors will receive plus scores for exceeding targets and will receive minus scores for missing targets. Unlike most other CPCS performance indicators, the rating for Small Business Subcontracting may be based on performance during the previous CPCS surveillance period(s).

Similar to the other CPCS performance indicators, the top SQ performer will receive the full points available (The point range for Small Business Subcontracting will be as established by the Government, but will not be greater than +5 to –5).

The Government may eventually incorporate the Small Business Subcontracting performance indicator into the Service Quality performance indicator.

**(5) SERVICE QUALITY (SQ) – A plus or minus range of points.** The Government may measure a variety of mostly objective factors that contribute to the quality of service provided to ED and its borrowers. These factors may include accuracy and completeness, rejections, bounced checks, customer satisfaction or other factors. In addition, the Government may, at its discretion, incorporate the Small Business Subcontracting performance indicator into the SQ performance indicator.

Unlike most other CPCS performance indicators, the SQ rating may be based on performance during the previous CPCS surveillance period(s). The Government does not plan to apply an SQ measurement at the start of the Task Order. Prior to the first account transfer to which an SQ measure will apply, the Government shall provide to the Contractor the measurement factors, relative weights, point range, targets, formulas and methodology related to calculation of the Service Quality performance indicator.

(f)   The Government reserves the right to change any aspects of the CPCS, including but not limited to the formulas, relative weights assigned to performance indicators, point ranges, possible exclusion of specified types of administrative resolutions from either the ASP or the APR, or the frequency or methodology of calculation. The Government shall give written notice to the Contractor at least thirty days before the start of the first CPCS period affected by a change to any aspect of CPCS set forth elsewhere in this clause.

## H.6   SPECIAL TASK ORDER BONUS PAYMENT PLAN

(a)   **Bonus Incentives**—The top performers under these Task Orders set the standards by which all PCA contractors are measured. These high standards help drive better performance by all PCA contractors under the Task Orders. The purpose of the bonus payment plan is to incentivize all contractors and to reward the contractors that provide the best performance under the Task Orders.

(b)   **Ties**—For purposes of earning bonus payments, PCA contractors with CPCS scores that are within one half (½) point of each other will be considered to be in a tie. If two or more PCA contractors finish in a tie within their respective pool, the Government will pay the bonus percentage to each contractor. If two PCA contractors finish in a tie for first place, the next highest ranked PCA will remain in third place.

(c)   **CPCS Scores**—All bonuses under this clause are based on the Contractor's performance as measured by CPCS. Notwithstanding any other terms of this Task Order, the contractor may not receive a bonus payment if its CPCS score applicable to that bonus is less than 65 points.

(d) **Base for Bonus Percentages**—The bonus payment will be applied to the dollars collected by the Contractor. For bonus payment purposes, dollars collected are defined as regular collections, administrative wage garnishment payments and the final sale of all FFEL debts rehabilitated. *No bonus will be applied to the transfer value of Direct Loan Program Rehabilitations.*

(e) **Initial CPCS Ranking**—As described in Clause H.5, Contractor Performance Evaluation, the first CPCS surveillance period will run from the first placement of accounts through March 31, 2010. At the end of the first CPCS period, the top three (3) contractors in the Unrestricted Pool will be paid the bonus payment for that quarterly surveillance period. The bonus payment plan will be based upon the following scale:

| Competitive Performance & Continuous Surveillance (CPCS) Ranking | Bonus |
|---|---|
| First | 5% |
| Second | 3% |
| Third | 1% |

For the contractors in the Small Business Pool, the top two (2) contractors will be paid the bonus payment for that quarterly CPCS surveillance period. The bonus payment plan will be based upon the following scale:

| Competitive Performance & Continuous Surveillance (CPCS) Ranking | Bonus |
|---|---|
| First | 5% |
| Second | 3% |

No Long-Term bonus will be paid on the initial CPCS surveillance period.

(f) **Long-Term CPCS Bonus**— Beginning with the second CPCS surveillance period and continuing through the base period of this Task Order, the long-term CPCS ranking will be based on the combined totals from all CPCS performance periods over the life of the Task Order. Beginning with the first CPCS period of the first option term of the Task Order, the "Long-Term" CPCS ranking will be based on the combined totals for the last seven (7) CPCS periods (i.e., 21 months). For this calculation the top three (3) contractors in the Unrestricted Pool will be paid a bonus on dollars collected for the most recently completed quarterly CPCS surveillance period based upon the following scale:

| Competitive Performance & Continuous Surveillance (CPCS) Ranking | Bonus |
|---|---|
| First | 5% |
| Second | 3% |
| Third | 1% |

For the contractors in the Small Business Pool, the top two (2) contractors will be paid the bonus payment for that quarterly CPCS surveillance period. The Long-Term bonus payment plan will be based upon the following scale:

**Competitive Performance & Continuous**
Surveillance (CPCS) Ranking | Bonus
--- | ---
First | 5%
Second | 3%

(g) **Quarterly CPCS Bonus—** Beginning with the second CPCS surveillance period, will be based on contractors' performance during the quarterly CPCS surveillance period. The top three (3) contractors in the Unrestricted Pool will be paid the bonus payment for that quarterly CPCS surveillance period. The bonus payment plan will be based upon the following scale:

**Competitive Performance & Continuous**
Surveillance (CPCS) Ranking | Bonus
--- | ---
First | 3%
Second | 2%
Third | 1%

For the contractors in the Small Business Pool, the top two (2) contractors will be paid the bonus payment for that quarterly surveillance period. The bonus payment plan will be based upon the following scale:

Competitive Performance & Continuous
Surveillance (CPCS) Ranking | Bonus
--- | ---
First | 3%
Second | 2%

(h) **Maximum Bonus Payments—** No contractor may earn more than 6% in combined bonuses during any CPCS surveillance period. The top performer on the Long-Term CPCS ranking will only be eligible for an additional 1% bonus regardless of its ranking on the "Quarterly" CPCS. The second place agency on the Long-Term CPCS ranking may not earn more than 5% in combined bonuses during any CPCS period. The second place agency on the Long-Term CPCS ranking will only be eligible for an additional 2% bonus if it finishes first on the "Quarterly" CPCS, and only 1% for a second or third place finish. All other agencies will be eligible for the full amount of the listed "Quarterly" CPCS bonuses. Thus, the maximum percentage a PCA in the Unrestricted Pool may receive in combined bonuses during any CPCS surveillance period is:

| Contractor's Long-Term Ranking | Contractor's Quarterly Ranking | | | |
| --- | --- | --- | --- | --- |
| | #1 | #2 | #3 | below #3 |
| #1 | 6% | 6% | 6% | 5% |
| #2 | 5% | 4% | 4% | 3% |
| #3 | 4% | 3% | 2% | 1% |
| Below #3 | 3% | 2% | 1% | 0% |

The maximum percentage a PCA in the Small Business Pool may receive in combined bonuses during any CPCS surveillance period is:

| Contractor's Long-Term Ranking | Contractor's Quarterly Ranking | | |
|---|---|---|---|
| | #1 | #2 | below #2 |
| #1 | 6% | 6% | 5% |
| #2 | 5% | 4% | 3% |
| Below #2 | 3% | 2% | 0% |

## H.7   CPCS STANDING AND PERFORMANCE RANGE

(a)   The CPCS performance range is defined as Scoring 55 or more points on an individual CPCS.

(b)   A finish within the CPCS performance range does not assure that the Contractor will receive a Task Order extension under the option clause or any other provisions of this Task Order. Decisions to extend the Task Orders will be based on a total range of issues, completely within ED's discretion.

(c)   Other factors being equal, for purposes of this Task Order, the Government considers CPCS scores:

1.   Of 85 or higher to be an indicator of Outstanding performance;
2.   From 75 up to 85 to be an indicator of Excellent performance;
3.   From 65 up to 75 to be an indicator of Good performance;
4.   From 55 up to 65 to be an indicator of Average performance;
5.   From 45 up to 55 to be an indicator of Below Average performance; and
6.   Below 45 to be an indicator of Poor performance.

These adjectival ratings are intended to serve as convenient groupings and references within the context of these Task Orders and the contractor's PCA pool. They do not necessarily reflect past performance ratings that the contractor would receive either under this Task Order or for any future procurement. The Government may consider other factors including, but not limited to: complaints, small business subcontracting, security risks or violations, computer system inadequacies, or deficiencies in procedures, quality control or training.

## H.8   SMALL BUSINESS MENTORING

(a)   A contractor that receives an award under the Small Business Pool shall promptly establish a relationship with a mentor from among the Unrestricted Pool PCA contractors. (The Contracting Officer may waive this requirement upon request of a small business, if the small business provides evidence that mentoring assistance is unnecessary.) Within 30 days of contract award, the small business contractor shall send a notice to the Contract Specialist and the Contracting Officer's Representative indicating the name of the mentor selected. A small business may only change its mentor with the prior written authorization of the Contracting Officer. If the small business contractor is unable to locate a suitable large business mentor within 30 days of Task Order award, ED will try to facilitate an arrangement. ED may assign a mentor from the Unrestricted Pool to a small business, if the Contracting Officer determines such action appropriate to the circumstances.

(b)   ED Experienced PCA contractors in the Unrestricted Pool are encouraged to enter into mentoring relationships with a small business PCA contractor. ED reserves the right to require the contractors in the Unrestricted Pool to establish a mentoring arrangement with a designated